UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No.  24-329 (JWB/SGE)

_____

UNITED STATES OF AMERICA,

          Plaintiff,                         **DEFENDANT'S**
vs.                                    **POSITION REGARDING**
                                          **SENTENCING**

JOSEPH ROBINSON,

          Defendant.

_____

## I.      <u>**Introduction**</u>

It may be tempting to view Mr. Robinson's conduct in isolation, focus solely on the offense at issue, and conclude that a substantial term of incarceration is warranted—one that would irrevocably impact not only Mr. Robinson's future, but also the well-being of his innocent family.  However, such an outcome in this case would be misguided.  In light of Mr. Robinson's clear acceptance of responsibility and his genuine remorse, as well as his conduct while this case has been pending, defense counsel respectfully submits that a significant downward variance to probation is both appropriate and consistent with the interests of justice.

Mr. Robinson's relationship with the victim evolved over time from that of a former neighbor to one resembling a familial, father-son dynamic.  As that relationship deepened, it is true that Mr. Robinson derived financial benefit in ways that he admits took advantage of that trust and relationship.  However, that characterization alone presents an incomplete picture.  The evidence also demonstrates that Mr. Robinson was,

in many respects, the primary—and in fact only—consistent source of care and support in the victim's life. He provided companionship, assisted with daily needs, and ensured the victim attended medical appointments and received necessary care. While the government may focus solely on aspects of financial impropriety, it cannot be overlooked that this relationship was also marked by genuine closeness, reliance, and caregiving on the part of Mr. Robinson. Unfortunately, that relationship turned into one in which Mr. Robinson abused the victim's trust and reliance as the relationship grew.

Page two of the plea agreement supports the fact that the financial relationship between Mr. Robinson and the victim started in 2018, and the majority of the fraud occurred between 2018 and 2022, well before the victim was diagnosed with *Major* Neurocognitive Disorder in the summer of 2023. In 2018, the victim was only diagnosed with *Mild* Neurocognitive Disorder.

Since the conclusion of this offense, Mr. Robinson has worked remarkably hard to overhaul his life over the past two years. He has abided perfectly with his pretrial release conditions including having no use of controlled substances or alcohol, submitted to substance testing, complied with financial monitoring, has not taken out new lines of credit and obtained no new charges. He has remained close with his family and children and volunteered on many occasions to help the homeless and has changed his life to address his mistakes made in this case. He has tried to make changes.

Mr. Robinson, who for the first time at age 45, committed a crime of this nature.[1] What began as a simple relationship evolved into a fraudulent one. But that is not the whole story. The PSR revealed that Mr. Robinson endured serious traumas as a child and teenager-things no child should ever have to deal with. (PSR ¶ 46). He was "jumped" on many occasions, robbed and beaten and had to avoid gangs and distance himself from engaging in gang related behaviors. His family home was burglarized many times while the family was present. He had a very difficult childhood.

Despite his difficult upbringing, Mr. Robinson made the best life he could. He is supported by his family and he supports them. He has three adult-aged children, ages 25, 23, and 21, all of which he has a close relationship. He has raised his children with his significant other, whom Mr. Robinson has been partners with for over 27 years. Mr. Robinson helps his family in every way he can, financially and emotionally, and he talks with his children every day. Not only that, he helps strangers. Every two weeks, Mr. Robinson volunteers and helps feed homeless people in the community. He gives to those less fortunate. Mr. Robinson does not gamble or use alcohol or drugs.

Mr. Robinson is employed full-time. Since 2021, he has been employed by Courier Sources in Burnsville, Minnesota, where he works 36 hours a week and earns over $3,000 a month. Prior to that, he was self-employed as a painter and acquired clients through referrals due to his good work. While Mr. Robinson does have modest

---

[1] Mr. Robinson's only significant criminal history is a felony drug case from 26 years ago and has a criminal history score of 1.

net worth, he has no liquid assets and his total monthly cash flow is negative $985.85. (PSR ¶ 64).

Mr. Robinson's positive conduct following the offense extends well beyond his dedication to supporting his family and remaining employed. He has fully accepted responsibility for his actions and confronted the consequences of his conduct directly. Consistent with that acceptance, he entered a guilty plea pursuant to the plea agreement, refrained from contesting the charges or exercising his trial rights, and has been fully cooperative with the Court, probation, and counsel throughout these proceedings. Notably, he declined to pursue any legal strategy that might have delayed resolution of the case, even when potential evidentiary weaknesses could have been explored. He chose not to put the victim through a trial and pled guilty.

As stated, Mr. Robinson has been fully compliant while on pretrial release, demonstrating respect for the Court's authority and made a commitment to lawful conduct. He has expressed a sincere desire to improve himself and avoid repeating past mistakes and poor decisions. In sum, Mr. Robinson is taking meaningful and concrete steps toward rehabilitation, and his efforts have not gone unnoticed by those closest to him who remain proud of his progress.

## II.    Acceptance of Responsibility

Mr. Robinson wrote an Acceptance of Responsibility statement for the PSR:

> From around July 2018 through August 2024, in the State and District of Minnesota, I made choices that deeply hurt my adoptive father. After we reconnected in 2018, we tried to rebuild the bond we once had when I was

a child. At first, I helped him with work on his house and spent time with him in ways that felt meaningful. Over time, I began taking him to doctor appointments, helping with his legal matters, and becoming part of his life again. Eventually, he adopted me and became my father in every sense of the word.

Looking back now, I feel overwhelming sadness and regret for what I did. The money I took from him, mostly through checks, was gained through deception, and it violated the law as my attorney has explained to me. But beyond the legal violation, what pains me most is the personal betrayal— I broke the trust of someone who loved me, cared for me, and believed in me.

There is no excuse for my actions. I knew what I was doing, and I guess at the time I tried to justify it in any way I could. I accept full responsibility for the choices I made and for the pain I caused him and anyone else. I think every day about how I failed him and how I wish I could go back and do things differently. I am deeply, sincerely sorry to my father for the hurt, disappointment, and loss I caused. My hope now is to take accountability, learn from my mistakes, and live in a way that honors the love and trust I once received from him, and reflect how I have tried to change since this terrible event started.

(PSR ¶ 18).

## III.    <u>**Legal Standard in Sentencing and PSR Objections**</u>

The law on sentencing is well-settled. *United States v. Rivera*, 439 F.3d 446, 447 (8th Cir. 2006); *United States v. Haack*, 403 F.3d 997, 1002-03 (8th Cir. 2005). At sentencing, the Court is to first rule on any material unresolved factual objections to the PSR and must resolve any legal disputes. FED. R. CRIM. P. 32(i)(3)(B). The Court is then to determine the statutory minimum and maximum sentences, calculate the advisory guidelines range, and determine whether any departures or variances from that range are appropriate.

A defendant has a Constitutional right to have their guidelines correctly calculated. When a defendant objects to a guideline enhancement, the government bears the burden of proving that enhancement is applicable by providing evidence to support that by a preponderance of the evidence. *United States v. Berrier*, 28 F.4th 883, 887 (8th Cir. 2022). *Accord United States v. Munoz*, Crim. No. 11-167 (JRT/AJB) at *4 (D. Minn. Oct. 3, 2012).

Finally, the Court is to consider the 18 U.S.C. § 3553(a) factors and decide what the appropriate sentence should be. In doing so, the guidelines are supposed to "provide a starting point or 'anchor' for judges," *United States v. Kladek*, 651 F. Supp. 2d 992 (D. Minn. 2009) (quoting *United States v. Turner*, 548 F.3d 1094 (D.C. Cir. 2008)). But the Court's ultimate mandate is to craft a sentence "sufficient but not greater than necessary" to achieve the statutory sentencing aims articulated in 18 U.S.C. § 3553(a). Put another way, the Court is to impose the least severe sentence that will achieve the statutory goals. The appropriate least severe sentence here is probation.

IV.     **The "abuse of a position of trust" enhancement should not be applied.**

The defense objects to the PSR's legal conclusion that the U.S.S.G. § 3B1.3 enhancement for an "abuse of a position of trust" should be applied. PSR ¶ 24. This is not a factual dispute—the PSR accurately describes the essence of the crime. The Commentary to the Guidelines affirms that it is not sufficient to apply the enhancement merely where an employee defrauds their employer, for example. Instead, the person must hold a position of trust "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)"

6

and that position of trust "must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult).". U.S.S.G. § 3B1.3. The Commentary expands:

> This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

*Id*.

In *United States v. Jankowski*, 194 F.3d 878, 885 (8th Cir. 1999), the Circuit declined to apply the enhancement to a driver of an armored security car who abused his position to commit fraud. There, the Circuit discussed a number of cases where they found the enhancement applicable—positions including a senior partner at a law firm, a financial planning adviser/tax preparer, a bank president, an attorney engaged in billing fraud, and a police officer engaged in extortion. *Id*. It found these situations met the criterion of "substantial discretionary judgment that is ordinarily given considerable deference" in U.S.S.G. 3B1.1. Since then, the Circuit has also applied the enhancement to a landlord who defrauded his tenants, *United States v. Miell*, 661 F.3d 995 (8th Cir. 2012), and to "an office manager and bookkeeper" with discretion to maintain the Quickbooks software and "structure it in any way she saw fit[.]" *United States v. Natysin*, 966 F.3d 738 (8th Cir. 2020).

The defense submits Mr. Robinson's employment role here is not listed in the guidelines, or even somewhat similar to the roles cited … attorneys, bookkeepers, accountants, advisors, and landlords where the Circuit has applied the enhancement before.  In any case where a person defrauds their employer, for example, the relationship will involve an aspect of broken trust.  Mr. Robinson concedes that at one point he was the victim's power of attorney, but even still the relationship here was not one under which the enhancement is properly applied.

### V.    The "Vulnerable Victim" Enhancement Should Not be Applied.

Mr. Robinson objects to the 2-level enhancement for the victim being vulnerable.  A 2-level enhancement applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim."  USSG §3A1.1(b)(1).  A "vulnerable victim" is defined as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  *Id.* at application n.2.

The court does not apply a blanket presumption that any particular characteristic—such as advanced age—automatically renders a victim unusually vulnerable.  *U.S. v. Anderson*, 440 F.3d 1013 (2006).  Instead, the court applies a totality-of-the-circumstances analysis, examining factors such as the victim's age, education, work experience, lack of investment experience, and particular susceptibility to the defendant's conduct. *Id* at 1018.

As stated above, page two of the plea agreement supports the fact that the financial relationship between Mr. Robinson and the victim started in 2018, and the majority of the fraud occurred between 2018 and 2022, well before he was diagnosed with Major Neurocognitive Disorder in the summer of 2023.  In 2018, the victim was only diagnosed with "Mild Neurocognitive Disorder."   Here, given the totality of the circumstances, Mr. Robinson did not know that the victim was "unusually vulnerable" or that Mr. Robinson "knew or should have known" that the victim was that degree of being that vulnerable. The victim only became that way at the end of the crimes committed here.  He certainly knew that there were mental health issues that were present, but did not know that under the law he was "vulnerable" to the extent that the law requires.

## VI.  A Substantial Downward Variance is Necessary to Reflect the 3553(a) Factors and to Afford Justice.

The hardship suffered by Mr. Robinson described in the PSR is significant.  His § 3553(a) factors and the other arguments contained in this position paper support a substantial downward variance to probation.

Even in Zone D of the guideline grid, the 8th Circuit has consistently held that under the guidelines framework, post-*Booker*, variances can achieve the same practical result when justified by compelling circumstances under § 3553(a) factors.  Three examples are provided below.

First, *U.S. v. Wadena, 470 F.3d 735 (2006)* involved a defendant with an 18-month Guidelines range who received five years' probation instead of imprisonment. The 8th Circuit upheld this substantial variance, finding it reasonable based on the defendant's

age, serious medical needs requiring dialysis, and his unique role as caregiver for his son. The court explicitly rejected any "blanket rule that all downward variances that result in probation are unreasonable if the Sentencing Guidelines call for imprisonment."

Second, *U.S. v. Spero*, 382 F.3d 803 (2004), referenced in *United States v. Chettiar*, 501 F.3d 854, 856 (8th Cir. 2007), involved a level 13 offense (Zone D) where the district court imposed five years' probation, six months community confinement, and six months home detention instead of the mandated prison sentence. This was accomplished through an eight-level downward departure under the pre-*Booker* Guidelines, effectively shifting the zone overlay to allow non-prison alternatives.

Third, *U.S. v. Hadash, 408 F.3d 1080 (2005)* (also referenced in *Chettiar*) demonstrates a six-level variance that allowed four years' probation for what would have been a 12-18 month imprisonment range, effectively shifting Zone A treatment up to a level 13 offense.

Mr. Robinson's history and characteristics are discussed in detail above. They show a person who is scarred by trauma he suffered as a child and who has chosen to, for the first time in his life, undertake the difficult journey of disentangling that trauma from his criminal behavior. Mr. Robinson is well down that path and is committed to continuing down it. His future is bright. The PSR recognized factors that might warrant a sentencing outside the guidelines:

> The defendant was raised within a large family by his single mother after the passing of his father. He was exposed to violence and adversities within the communities of his upbringing, where his mother relocated from in attempt to provide better accommodation for her children. The defendant has fathered three children, two of whom he reared in his

10

home, where they remain in their adulthood.

(PSR ¶ 86).

The nature of the offense is serious, but that seriousness is tempered by Mr. Robinson's lawful pre-trial conduct, his motivations to become a better person and the tremendous support he provides to his family.

Deterrence and "protecting the public from further crimes" are serious considerations in all cases. But those considerations are far stronger for offenses that are the product of a rational, deliberative thought process. Deterrence is important when the would-be-offender weighs the pros of committing the offense with the cons of a term of imprisonment. Mr. Robinson's record—and the facts underlying this case—show that Mr. Robinson conduct involved an evolving pattern of financial abuse rather than a premeditated planned out scheme to defraud. He was in fact working for the victim and improving his house … the suggestion that no improvements were made is incorrect. The property was improved. Preventing further crimes in cases like this is not best achieved by issuing lengthy prison sentences to would-be-offenders but by fixing the problems with their disordered thought processes. Just as Mr. Robinson is attempting to do here.

Accordingly, these considerations carry less weight than it would it first appear, and a sentence at or approaching the guidelines would be "greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a).

## VII.   Support Letters

Attached and filed as restricted are three support letters from Mr. Robinson's family.

His sister writes:

"Joseph has consistently demonstrated a strong sense of responsibility and commitment to his family.  He is dependable, supportive, and actively involved in assisting with family needs whenever he is able."

His significant other writes:

" …. I am the mother of his children. Through my experience, I have come to know him on both a personal level and as a parent … as a person, Joseph is a responsible, respectful, hardworking Black Man.

He consistently demonstrates these traits through his actions and the way he interacts with others. He carries himself with integrity, kindness, dedication, and he takes his responsibilities seriously.  As a father, he is involved, caring, positive influence, and attentive. He makes an effort to be present in our children's lives by attending school events, helping with homework, spending quality time, and providing guidance. His relationship with the children reflects genuine love, care, and commitment. For example, Joseph has consistently shown that he is present for his children during the times they need him most, whether emotionally or personally. He has continuously demonstrated his willingness to provide guidance and reassurance.

There was also an occasion when Joseph stopped at a traffic light and noticed a homeless man without shoes. Without hesitation, Joseph removed the shoes from his own feet and gave them to the man before continuing to drive barefoot.

On another occasion, while stopping for gas, Joseph observed a couple of children attempting to steal items from the store. After informing the store clerk of the situation, he took the time to speak with the children about the consequences and negative impact of stealing. He then chose to pay for the items himself. These experiences reflect Joseph's compassion, generosity, and belief in helping guide and support others within the community. His actions demonstrate the mindset that it truly "takes a village" to uplift and encourage those around us.

Overall, I believe that Joseph is a strong, positive, and reliable individual, as well as a devoted father to our children. He is deeply loved

and respected by many people within his family and community. I fully support this Black Man surviving in America and I pray strength that he continues to demonstrate resilience, character, and dedication despite the challenges he has faced."

His daughter Kiyareil writes,

"My father has been more than a parent to me.  He has been a steady foundation, a source of wisdom, and a reflection of strength throughout my life.

My dad's love is grounded in treating others the way he would want to be treated because he has seen the cruelties of the world firsthand.  I have witnessed him live this out in many ways, from buying meals for those less fortunate to standing up for people who didn't or don't have the means to stand up for themselves.

Because of him, I have learned the value of self-respect, discipline and importance of putting the needs of others before my own."

### Conclusion

For the above reasons, Mr. Robinson respectfully submits that the Court should not apply the enhancements listed above and issue a substantial downward variance to probation.  Such a sentence would reflect the work Mr. Robinson has put into healing his past trauma, his poor decisions in this case, and would allow him, his family and society to continue to move towards the promising future that he is building.  One that can help pay the restitution that will be owed in this case.

Respectfully submitted,

Dated: May 8, 2026                        /s/ Ryan Garry

Ryan P. Garry (Attorney No. 0336129)
Ryan Garry, Attorney, LLC
333 South 7th Street, Suite 2350
Minneapolis, MN 55402
Phone: (612) 436-3051
ryan@ryangarry.com

13